Filed 8/18/20; Certified for Publication 9/10/20 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MOHAMED ALJABBAN, | D076214 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVDS1312923) |
| FONTANA INDOOR SWAP MEET, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Donald Alvarez, Judge.  Reversed with directions.

Law Office of Ugo Harris P. Ejike and Ugo-Harris P. Ejike for Plaintiff and Appellant.

Borton Petrini and Joseph L. Richardson for Defendants and Respondents.


Mohamed Aljabban appeals from an adverse judgment after a bench trial in the lawsuit that he and his wife, Jacqueline Carrasco, filed against Fontana Indoor Swap Meet, Inc. (FISM), Jonathan Shapiro and Victor

Ramirez (collectively, defendants).[1] Aljabban also separately appeals from the orders awarding attorney fees and costs to defendants.

Aljabban and Carrasco operated a beauty salon on the premises of an indoor swap meet managed by FISM and its president, Shapiro. Aljabban contends that (1) the trial court erred in concluding that he and Carrasco were not permitted to remove a sink/cabinet unit, a water heater and some decorative molding when vacating the premises of the beauty salon; (2) FISM and Shapiro improperly withheld $680.00 of the security deposit to cover expenses it incurred to repair damage to the premises; (3) the trial court should have found that FISM and Shapiro breached the parties' agreement under which Aljabban and Carrasco occupied the premises because they wrongfully failed to renew it; and (4) he did not receive a fair trial because of alleged misbehavior during trial by Shapiro.

We conclude that only one of Aljabban's contentions has merit. Specifically, FISM was not entitled to withhold $680.00 of the security deposit to cover the expense of repairing damage to the premises, as the parties did not specifically agree that the security deposit could be used to cover repairs. Accordingly, we will reverse the judgment and direct the trial court to enter judgment in favor of Aljabban against FISM in the amount of $680.00 on the breach of contract and conversion causes of action, and in favor of defendants on all remaining causes of action. Further, because we reverse the judgment, we also reverse the attorney fee and costs award, and we remand for further proceedings on the issue of attorney fees and costs.

---

[1] We identify Carrasco as Aljabban's wife because they were married during the events giving rise to this lawsuit, although they were divorced at the time of trial.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Swap Meet*

FISM operates an indoor swap meet in the city of Fontana (the Swap Meet), consisting of a collection of approximately 75 businesses operating under one roof in individually assigned spaces provided to them by FISM under the terms of a vendor's permit that FISM enters into with each business on an annual basis. Shapiro is the president of FISM, and Ramirez worked as a security guard at the Swap Meet during the relevant time period. FISM does not own the building in which the Swap Meet is located, but instead leases it from a landlord.

Among the businesses in the Swap Meet are shoe stores, clothing stores, a pet store, a tattoo parlor, an optometrist, and a snack bar. Since it opened in 1992, the Swap Meet has dedicated an approximate 400 square foot area (space H-2) for use as a beauty salon business. According to Shapiro, when a beauty salon was first established in space H-2, FISM installed sinks and a water heater. There were two sinks on the wall and one in a cabinet that was connected to the wall.

B.  *The Vendor's Permit That Carrasco and Aljabban Entered into with FISM*

Ruth Garcia operated the beauty salon in space H-2 from 1992 until she retired and sold her business to Aljabban and Carrasco in July 2011 for $15,000. After Garcia informed FISM that she intended to sell her business to Aljabban and Carrasco, FISM approved Garcia's transfer of space H-2 to them and entered into a vendor's permit with Aljabban and Carrasco.

Shapiro testified that the vendor's permit FISM entered into with Aljabban and Carrasco was the same form contract that FISM uses for all of its vendors, customized only to specify the name of the business, the business

3

owners, a description of the type of commercial activity the vendor is permitted to engage in at the swap meet, the amount of monthly rent, and the amount of the security deposit. The vendor's permit that Carrasco signed in July 2011 specified Aljabban and Carrasco were the owners of the business to be operated in space H-2 under the name "Millenia Beauty Salon," that the permit was for "hair salon" and "nail salon" uses, that the monthly rent would be $1340.00, and that the security deposit was $2,680.00. The vendor's permit stated the "Commence Date" was August 1, 2011, and the "Expiration Date" was August 1, 2012. On July 15, 2012, FISM entered into a renewed vendor's permit with Carrasco and Aljabban for the dates of August 1, 2012 to August 1, 2013, with identical terms to the original vendor's permit.

As the vendor's permit is a central document in this lawsuit, we turn to the relevant provisions in that document. Under the heading, "License Agreement," the vendor's permit sets forth 25 separate paragraphs constituting the terms of the agreement that Carrasco and Aljabban entered into with FISM.

As relevant here, paragraph 1 specifies that "Vendor is a licensee only. This agreement is not intended to create a landlord tenant relationship. The terms of this license is for the dates indicated above. This License Agreement supersedes any prior contract or agreement between [FISM] and the Vendor named above in this contract. The prior contract if any is null and void as of the commencement date of this contract."

Paragraph 4 states, "Booth construction (i.e. walls, flooring, and security gates) becomes a permanent fixture with the Swap Meet and may not be removed or demolished by Vendor upon termination of the license."

Paragraph 7 states, "Vendor shall not sell, transfer, or assign Vendor's space or permit anyone else to occupy it or conduct business from Vendor's

space without Management's prior written consent. Vendor will forfeit his entire Security Deposit if he violates this clause and sells, transfers or assigns his space without the consent of Management. . . . Management shall not unreasonably withhold consent to assignment of the License Agreement. . . ."

Paragraph 15 states, among other things, "Management reserves the sole right to terminate this license agreement for any violations of this License Agreement or any rules and regulations in effect. . . . Vendor's Security Deposit is not to be used as Vendor's final month's rent unless approved by Management. Management reserves the sole right to apply Vendor's security deposit toward any monies owed for the free rent or rental concession period . . . ."

Paragraph 17 states, "Management reserves the right to cancel this License prior to the commencement of the term on three (3) days written notice."

Paragraph 22 states, "All merchandise and other property must be removed from the Vendor's space and the Swap Meet premises at the end of the term," and provides a handling and storage fee for failing to do.

Finally, Paragraph 24 contains an attorney fees provision, which states, "In the event it becomes necessary to institute legal proceedings to enforce the terms of this License, the prevailing party shall be entitled to an award of Attorney's fees and court costs."

According to Aljabban, he was not involved in running the salon, but he spoke with Shapiro in July 2011 before the parties entered into the vendor's permit. As Aljabban testified, he asked Shapiro for a 20-year lease, but Shapiro told him that FISM does not enter into long-term leases, although there would be an option to renew the vendor's permit as long as the rent was

5

paid. Aljabban did not read or sign the vendor's permit. Carrasco signed the vendor's permit, but she did not read it. Carrasco testified that a manager at FISM told her that as long as she paid the rent "everything was going to be okay" and she "could be there for as long as [she] wanted to." Carrasco expected to be in space H-2 for "a long time" because Garcia had operated her business in that space for many years. When Carrasco signed the renewal of the vendor's permit for the period August 1, 2012 to August 1, 2013, Carrasco had no substantive discussion with anyone at FISM about its terms, which were the same as the terms of the previous vendor's permit.

C.    *Carrasco and Aljabban Extensively Remodel the Space*

Before moving into space H-2, Carrasco and Aljabban extensively remodeled it. According to both Carrasco and Aljabban, they spent approximately $30,000 to remodel the space. They installed new flooring, drywall, decorative molding, barber chairs, cabinets, and mirrors.

As especially relevant here, they also replaced and removed the sinks by putting in a new sink/cabinet unit, as well as installing shampoo bowls. The new sink/cabinet unit apparently replaced a similar unit that was already in the space,[2] and although the evidence is not clear, we infer that

---

[2]    The sink/cabinet unit is a one-piece item with the sink recessed into the top of a cabinet. Photographs of the item, as installed in space H-2, appear in the record. Aljabban has requested to include in the appellate record the actual sink/cabinet unit that was presented as a demonstrative exhibit at trial during his trial testimony. At trial Aljabban testified that the exhibit was similar to the sink/cabinet unit that was left behind in space H-2. On May 1, 2019, the court of appeal issued an order stating that it would defer ruling on Aljabban's request to transmit the physical exhibit to the court. The order stated that "[t]he court will notify appellant's counsel if and when it is determined that it is necessary to view" the exhibit. We have determined that it is not necessary for us to view the exhibit for the purpose of resolving the issues presented on appeal, and we therefore deny Aljabban's application to deliver the sink/cabinet unit to the court of appeal.

the new shampoo bowls replaced the two wall-mounted sinks that Shapiro testified he installed. As also relevant here, Carrasco and Aljabban replaced the water heater, locating it inside the sink/cabinet unit, as Carrasco believed the preexisting water heater was old, and she wanted one with a larger capacity. FISM was not aware that Carrasco and Aljabban replaced the sinks and water heater, and according to the testimony of Shapiro and of an FISM manager, FISM would have provided and installed new sinks and a new water heater, if needed, using a licensed plumber.

D.    *After Business at the Salon Declines, FISM Declines to Renew the Vendor's Permit in 2013*

According to the evidence presented at trial, the volume of business at the Millenia Beauty Salon declined over time, and Carrasco lost or fired the employees who had been working in the salon with her. As one FISM manager testified, "it [was] like a ghost town" in the corner of the Swap Meet where the salon was located. As Shapiro characterized the situation, "her business had deteriorated to nothing."

On June 26, 2013, Carrasco entered into a listing with a real estate agent to try to sell the salon business for $30,000. According to Carrasco, she told Shapiro and managers at FISM that she was trying to sell her business. Shapiro and the FISM managers, in contrast, testified that they had no knowledge of Carrasco's intention to sell. FISM would have welcomed a sale of the business, as the new owner might have made it more successful.

On July 11, 2013, FISM sent a notice to Carrasco and Aljabban, informing them that FISM would not be renewing the vendor's permit at the end of the one-year term, and that they should vacate the space by August 11, 2013. According to Shapiro and managers at FISM, they decided that they would not renew the vendor's permit because the salon is the main

7

anchor business at the Swap Meet, but it was not successful under Carrasco's management.

At some point after FISM issued the notice to vacate, the real estate agent informed Carrasco she had located a potential buyer for the salon. However, Carrasco told the agent she would not be able to sell the business because her permit for the space had not been renewed. Carrasco did not approach FISM with any information about a potential buyer.

E.   *In Vacating the Space, Carrasco Attempts to Take the Sink/Cabinet Unit, the Water Heater, and the Decorative Molding*

On the morning of August 4, 2013, Carrasco, along with her mother and another helper, arrived at the swap meet with a U-Haul truck to move out of the space. An FISM manager discovered that Carrasco was attempting to remove certain items the manager considered to be fixtures that Carrasco did not have the right to take with her, including the sinks, the water heater and the decorative molding. Carrasco believed that she had the right to take the items because she paid for them during the remodel, and she called the police after the FISM manager told her she had to leave behind the items. When the police arrived, Carrasco agreed to leave the disputed items in the space and to resolve the issue in court, but when the police left the premises, Carrasco again acted to take the items. FISM called the police to come back, and Carrasco was prevented from taking anything else. As a result, the sink/cabinet unit, the water heater and some pieces of decorative molding were left behind in the space.[3]

---

[3]   Although the parties do not focus on the issue, it appears from the photos of the space after Carrasco moved out, as well certain witness testimony, that FISM did not succeed in preventing Carrasco from removing and taking with her the two shampoo bowls that were installed on the wall in space H-2. Much of the decorative molding is removed from the walls in the

Security guard Ramirez interacted with Carrasco while she was attempting to take the disputed items. According to Carrasco's testimony, Ramirez struggled with her over the decorative molding, hit her, and caused bruising. Carrasco's mother, who was helping with the move, testified that Ramirez shoved her to the ground. Ramirez testified that he never had any physical contact with Carrasco and did not push Carrasco's mother to the ground. Instead, he took back some decorative molding from Carrasco's mother by grabbing the molding, in response to which Carrasco's mother tried to pry the molding from Ramirez's fingers, causing him to release his grip. Ramirez then blocked Carrasco's mother from coming back in the door, and she pushed him.

After Carrasco vacated the space, FISM eventually refunded $2,000.00 of the $2,680.00 security deposit to Carrasco and Aljabban. Shapiro testified that after Carrasco and Aljabban vacated space H-2, he incurred expenses because he had to (1) purchase two new sinks and remount them; (2) repair a portion of the floor that was removed; (3) fix holes in the drywall where Carrasco had removed the decorative molding; and (4) with respect to the water heater, properly strap it down and hire an electrician to rewire it correctly. Shapiro stated that he withheld $680.00 of the security deposit to cover those expenses.

Sometime after space H-2 was vacated, a former employee of Garcia and Carrasco noticed that the space was available. FISM agreed to allow her to operate a salon in the space.

---

photos, although it is unclear if any pieces of decorative molding were removed from the wall but left behind somewhere else in the space. No evidence was presented as to the value of the sink/cabinet unit, the water heater, or the decorative molding that was left behind.

F.    *The Litigation of Aljabban and Carrasco's Lawsuit*

    1.    *The Complaint*

On October 24, 2013, Aljabban and Carrasco filed a complaint against FISM. A first amended complaint added Shapiro as a defendant, and the operative second amended complaint (the Complaint) added Ramirez.

As relevant here, the Complaint alleged the following causes of action: (1) breach of contract against FISM and Shapiro; (2) breach of the covenant of good faith and fair dealing against FISM and Shapiro; (3) intentional interference with prospective economic advantage against all defendants; (4) civil assault and battery against all defendants; (5) negligent interference with prospective economic advantage against all defendants; (6) unjust enrichment against FISM; and (7) conversion against FISM.[4]

The Complaint alleged, "A significant aspect of the contractual relationship was not in writing, for example, the understanding that Plaintiffs had the right to take with them, at the end of the relationship, their business fixtures like water heater, sink, flooring accessories, stand-alone fans, blow-dryer, mirrors and similar detachable commercial equipment necessary to run their business . . . ." According to the Complaint, plaintiffs "spent a lot more money to build up [the] business including trade fixtures like water heaters, sinks, moldings, et cetera[,] [based] on the agreement with Defendants[,] particularly Shapiro[,] that they could remove or sell those trade fixtures if they had to move or sell the business."

---

[4]    The Complaint also alleged a cause of action for discrimination under the Unruh Civil Rights Act (Civ. Code, §§ 51, 52) against FISM based on alleged national-origin and sexual-orientation discrimination, which plaintiffs voluntarily dismissed prior to defendants' filing of their motion for summary adjudication.

Further the Complaint alleged that the parties entered into a "mutual oral agreement that each party has the right to renew the contract every year and if either party would not renew then adequate notice for yearly tenancy would be given to the other party to allow for orderly relocation and removal of the trade fixtures and Plaintiffs' business good will." Specifically, the Complaint alleged that "[u]nder the oral terms, each party was entitled to adequate legal notice in the event one side decided not to renew. Plaintiffs understood this 'adequate notice' to be a minimum of 60 days."

With respect to the nature of the parties' relationship, the Complaint alleged that the parties entered into a landlord/tenant relationship despite the language in the vendor's permit stating otherwise. According to the Complaint, "Defendant's unilateral description of relationship with Plaintiffs as 'licensee/licensor' does not change the fact that it was a landlord/tenant relationship and its overwhelming characteristics mirror [a] landlord tenant relationship including payment of rent, security deposit, utilities, etc."

The breach of contract cause of action was based on the theory that FISM and Shapiro were liable because (1) they gave plaintiff a 30-day notice, instead of a 60-day notice that FISM would not renew the vendor's permit; (2) they terminated the vendor's permit even though "Plaintiffs did not violate the agreement or any regulations;" (3) they "denied Plaintiffs the ability to sell or transfer the business" in breach of the requirement that FISM "not unreasonably deny Plaintiffs the right to sell or transfer the said business;" and (4) they withheld $680.00 of the security deposit.

The cause of action for breach of the covenant of good faith and fair dealing was based on allegations similar to those in the breach of contract cause of action, along with an allegation that FISM and Shapiro "seized [plaintiffs'] personal property within the said business."

11

The cause of action for intentional inference with prospective economic advantage alleged that defendants "arbitrarily and intentionally acted to thwart" plaintiffs' sale of their business, and "intentionally appropriated the business good will and personal property of Plaintiffs." Similarly, the cause of action for negligent interference with prospective economic advantage alleged that defendants breached a duty to "not take action that would disrupt Plaintiffs' ability to re[-]sell, transfer or assign the business."

The conversion cause of action was based on the allegation that FISM wrongfully prevented plaintiffs from taking the "water heater, sink and other business accessories," and that FISM wrongfully failed to return $680.00 of the security deposit. The unjust enrichment cause of action was based on similar allegations.

Finally, the civil assault and battery cause of action alleged that "[d]efendants and their agents including . . . Ramirez . . . physically injured . . . Carrasco and her associate . . . causing bruises, swelling, redness, pain, anxiety, distress and humiliation requiring medical attention."

2.    *The Summary Adjudication Motion*

Defendants brought a summary adjudication motion that challenged all of the causes of action except civil assault and battery. The trial court denied summary adjudication on all of the causes of action except for unjust enrichment.[5] However, the trial court made certain rulings that provided guidance as to the legal theories that would be viable at trial. Most significantly, the trial court concluded that the vendor permit was "at least partially integrated" so that the parol evidence rule barred evidence of contradictory terms, although "evidence of related oral understandings" could

---

[5]    The trial court held that unjust enrichment is not properly pled as an independent cause of action when based on an express contract.

12

be considered. The trial court explained that evidence of an oral agreement to "promise to renew indefinitely so long as rent is paid," would "be a contradictory term to the explicit one year term of the vendor license."[6]

### 3. *The Bench Trial*

In June 2017, the trial court held a bench trial on Aljabban and Carrasco's claims against FISM, Shapiro and Ramirez. The evidence at trial was as we have described above.

After the trial concluded, the court issued a tentative statement of decision, which it later adopted as its final statement of decision after rejecting the objections filed by Aljabban and Carrasco. The trial court concluded that plaintiffs had failed to establish liability on any of their causes of action.

First, addressing one of the grounds for plaintiffs' claims of breach of contract and breach of the covenant of good faith and fair dealing, the trial court found that the evidence did not support a finding that the parties agreed to a yearly renewal as long as the rent was paid.[7] As the trial court explained, "the face of the operative vendors permits clearly reflect a term of

---

[6] We note that the Complaint did not allege that plaintiffs would have the right to renew the vendor's permit as long as they continued to pay rent. Instead, as we have described, it alleged the parties entered into a "mutual oral agreement that each party has the right to renew the contract every year and if either party would not renew then adequate notice for yearly tenancy would be given to the other party to allow for orderly relocation and removal of the trade fixtures and Plaintiffs' business goodwill," and "[u]nder the oral terms, each party was entitled to adequate legal notice in the event one side decided not to renew."

[7] As the trial court understood plaintiffs' claims, the existence of an alleged agreement to renew the vendor's permit as long as the rent was paid was one of the theories in support of the causes of action for breach of contract and breach of the covenant of good faith and fair dealing.

13

one year.  The license agreements contain <u>no</u> language whatsoever reflecting an obligation by FISM to automatically renew these agreements from year to year.  . . . [¶]  The court does not find Ms. Carrasco['s] purported reliance on some alleged oral representation regarding automatic license renewal to be credible or reasonable in light of clear evidence through testimony of FISM representatives that no such representations were ever made.  This is further corroborated by clear evidence that FISM had a custom and practice of yearly re-renewal of license agreements for all its vendors.  Nothing was automatic so long as rent was paid.  This evidence does not support Plaintiffs['] position on this issue and the court so concludes."

The trial court then turned to the allegation that defendants wrongfully prevented plaintiffs from removing the sink/cabinet unit, the water heater and the decorative molding when vacating space H-2.  As the trial court explained, that allegation was relevant to plaintiffs' causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and conversion.  Citing a Civil Code provision concerning the circumstances under which a tenant may remove affixed items, the trial court concluded that "in the context of the landlord/tenant circumstance which this action clearly is," that provision of the Civil Code should be implied as a term of the parties' agreement.  Applying the Civil Code provision and relevant case law, the trial court described the applicable law:  "[E]ven [if] . . . a particular item may be moveable from real property, it does not mean it loses its character as a trade fixture, and can still be considered 'permanent' for purposes of identification as a trade fixture."  The court concluded,

> "It appears to the court, in the context of [paragraph] 4 of the license agreement, that the water heater, sinks cabinets and molding may properly be characterized as trade fixtures, and were meant to remain where they were as long as the H-2 space was operated as a beauty salon.

14

The prior tenant, Ms. Garcia, had used the space as a beauty salon. There was a water heater which was later replaced and affixed in the same spot as well as sinks and cabinets affixed to the premises. The molding was also affixed to the walls. These items, given the nature of the business could reasonably be meant to remain where they were so long as this H-2 space was operated as a beauty salon.

"In the court's view, the evidence presented supports a finding that these fixtures could not be removed without causing some injury to the premises, and at a minimum had become an <u>integral</u> part of the premises. Removal of the water heater sinks and molding would require some degree of repair and replacement before the premises would be suitable for continued operation as a beauty salon.

"The water heater was connected to pipes and sinks. The evidence presented indicates these items were installed in wooden cabinets and affixed to the wall. A hair salon cannot reasonably operate without access to hot water and sinks. The fixtures were <u>integral</u> to the operation of the business.

"Based on the foregoing, the court finds no breach of the vendor license agreement by Defendant related to the trade fixtures or their retention."

Next, the trial court addressed the allegation that defendants breached the covenant of good faith and fair dealing when they "purportedly arbitrarily denied Plaintiffs the opportunity to sell or transfer their business; arbitrarily terminated their license or occupancy; [and] made monetary gain from re-letting Plaintiffs business goodwill to [a] new tenant who diverted Plaintiffs customers." The trial court found "no credible evidence that Defendants were ever asked during the relevant time period to transfer the space to a new tenant. Clearly it would have been in the best business interest of FISM to consider any viable tenant for the space. Further, there was insufficient

15

evidence to establish Defendants somehow were involved in diverting Plaintiffs' business customers to the new tenant . . . . Additionally, the terms of the vendor license agreement did not require a reason or cause to not renew the license."

The trial court also found no merit to the causes of action for intentional and negligent interference with prospective economic advantage. "[T]he court finds insufficient evidence to establish an economic relationship existed between Plaintiffs and a third party which contained a reasonably probable future economic benefit or advantage to Plaintiffs. The court finds no evidence of any intent by Defendants to interfere with any business relationship or evidence of other inappropriate or legally actionable conduct by Defendants. There was nothing to indicate FISM took any action to disrupt Plaintiffs ability to re-sell, transfer or assign the business to some third party."

With respect to the allegation that defendants were liable for breach of contract, breach of the covenant of good faith and fair dealing and conversion because FISM returned only $2,000.00 of the $2,680.00 security deposit, the trial court found that "it appears the bulk of Plaintiffs security deposit was returned after adjustment for damage caused by the removal of some of the molding."

Finally, with respect to the civil assault and battery allegations, the trial court stated that it found Ramirez to be credible. Accordingly, the court found that "Mr. Ramirez never made any physical contact with Ms. Carrasco or other assaultive acts."

The trial court subsequently entered judgment in favor of defendants on all of the causes of action.

16

Plaintiffs filed a motion to vacate the judgment and a motion for new trial. No points and authorities were submitted to support the motion for a new trial. However, in support of the motion to vacate the judgment, plaintiffs argued that the judgment was contrary to applicable law with respect to (1) FISM's retention of the $680.00 of the security deposit, and (2) plaintiffs' right to remove the sink/cabinet unit, the water heater and the decorative molding. Further, in support of the motions, Aljabban filed a declaration describing the atmosphere in the courtroom during trial, which he claimed made it impossible for plaintiffs to receive a fair trial. Specifically, Aljabban stated that (1) "Shapiro was constantly making faces, mocking signs and gestures . . . while Carrasco was on the witness stand testifying" and then "stepped up the mockery and threats" during Aljabban's testimony; (2) during Shapiro's testimony, "his attorney was constantly giving him signals as to how to answer questions from [plaintiffs' counsel]"; and (3) he observed "Shapiro signaling witnesses related to Defendants how to respond to the questions." The trial court denied the motions.

On April 5, 2018, the trial court also issued an order, based on the attorney fees provision in the vendor's permit, requiring Carrasco and Aljabban to pay defendants' attorney fees in the amount of $121,043. On May 25, 2018, the trial court issued an order awarding $14,374.60 in costs to defendants.

Aljabban filed a notice of appeal from the judgment and from the orders awarding attorney fees and costs. Carrasco is not a party to this appeal.

17

II.

DISCUSSION

A.    *Standard of Review*

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)  In applying a substantial evidence standard of review, " ' "[I]t is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it." ' [Citation]  Where multiple inferences can be drawn from the evidence, we defer to the trial court's findings." (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292 (*Orange Catholic*).)

B.    *Aljabban's Challenge to the Trial Court's Finding That Plaintiffs Were Not Entitled to Take the Sink / Cabinet Unit, the Water Heater and the Decorative Molding*

Aljabban first challenges the trial court's finding against him on the causes of action for breach of contract, breach of the covenant of good faith and fair dealing and conversion to the extent those causes of action were based on the allegation that FISM wrongly prevented Aljabban and Carrasco from taking the sink/cabinet unit, the water heater and the decorative molding (collectively, "the Items") when vacating space H-2.

1.    *Aljabban's Contention That He Was Permitted to Take the Items Because He Was a Licensee, Not a Tenant*

As an initial predicate to his argument that he should have been permitted to take the Items from the space when moving out, Aljabban contends the parties entered into a licensee/licensor relationship, not a

18

landlord/tenant relationship as the trial court found.[8] According to Aljabban, this distinction is important because, as he reads the case law, a licensor may remove improvements to real property under different circumstances than a tenant. In support of his contention that he was a licensee, not a tenant, Aljabban points to the language of the vendor's permit which states, "Vendor is a licensee only. This agreement is not intended to create a landlord tenant relationship." As we will explain, Aljabban's reliance on his purported status as a licensee is unavailing for two reasons.

First, Aljabban is precluded from contending that his relationship with FISM was not, in substance, a landlord/tenant relationship, as his pleadings contain the opposite factual allegation.[9] Specifically, the Complaint alleges, "Defendant's unilateral description of the relationship with Plaintiffs as 'licensee/licensor' does not change the fact that it was a landlord/tenant relationship and its overwhelming characteristics mirror [a] landlord tenant relationship including payment of rent, security deposit, utilities, etc."[10] "The admission of fact in a pleading is a 'judicial admission.' Witkin describes the effect of such an admission: 'An admission in the pleadings is not treated procedurally as evidence . . . but may be commented on in

---

[8]    Specifically, Aljabban takes issue with the trial court's statement that the action "clearly" arose "in the context of the landlord/tenant circumstance."

[9]    More accurately characterized, the relationship would be a sublessor/sublessee relationship, as FISM did not own the building that housed the Swap Meet, and instead leased it from a landlord who owned the building.

[10]    The Complaint was not verified, but to the extent verification of the pleading has any significance, a similar allegation was made in the verified first amended complaint.

19

argument and relied on as part of the case.  And it is fundamentally different from evidence:  It is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues.  . . .' [¶] . . . ' "When a trial is had by the Court without a jury, a fact admitted by the pleadings should be treated as 'found.'  . . .  In such case the facts alleged must be assumed to exist.' " (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271.)  "At least in the absence of some showing of mistake or inadvertence by the pleading party . . . , and as long as the opposing party is not contesting the factual allegation . . . , there is nothing unfair or inappropriate about holding a party to the truth of its unverified factual allegations." (*Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117, 132, citations omitted.)  Accordingly, because the Complaint alleged "the fact that [the relationship with FISM] was a landlord/tenant relationship," Aljabban is bound to that factual allegation, and he may not, on appeal, pursue an argument that is premised on a contrary allegation.

Second, even were we to conclude that Aljabban is not precluded from arguing that he was a licensee rather than a tenant, his status as a licensee ultimately makes no difference to whether he was permitted to take the Items upon vacating the space.  The case law upon which Aljabban relies addresses situations in which a licensee has constructed improvements on real property.  (*Taylor v. Heydenreich* (1949) 92 Cal.App.2d 684, 686-688 [family member, who constructed a house and other structures on land obtained by the landowner through homestead, with no indication the owner had expected the payment of rent, was a licensee]; *City of Vallejo v. Burrill* (1923) 64 Cal.App. 399, 399-404 [a municipality, which constructed a water pipe on landowner's property with permission, was a licensee].)

20

However, the rule stated in those cases is that "[w]here structures are erected upon land by a mere licensee, consent on the part of the owner of the land that the structures shall remain the property of the licensee will be implied *in the absence of evidence showing a different intention.*" (*Taylor*, at p. 689, italics added.) " '[W]here the landowner consents to the placing of a building on his land by another *without an express agreement* as to whether it shall become a part of the realty or remain personalty, an agreement will be implied that it is to continue personal property.' " (*Burrill*, at p. 407, italics added.)

Here, the parties entered into an express agreement concerning how vendor improvements would be treated, defeating any attempt to imply an understanding to the contrary. Specifically, the vendor's permit states, "Booth construction (i.e. walls, flooring, and security gates) becomes a permanent fixture with the Swap Meet and may not be removed or demolished by Vendor upon termination of the license."

In short, Aljabban cannot take advantage of the presumption that a licensee's improvements to real property remain the property of the licensee in the absence of evidence or agreement to the contrary, because in this case there is plainly *evidence and agreement to the contrary.* Therefore, regardless of whether Aljabban was a licensee, we must turn to the terms of the parties' agreement to resolve whether Aljabban had the right to take the Items upon vacating space H-2.

2. *The Items Were Permanent Fixtures Under the Terms of the Parties' Agreement and the Applicable Law*

Turning to the parties' agreement, paragraph 4 states, "Booth construction (i.e. walls, flooring, and security gates) becomes a permanent fixture with the Swap Meet and may not be removed or demolished by Vendor upon termination of the license." The question presented is whether

the Items fall under the scope of this provision because they constitute booth construction and are thus permanent fixtures that may not be removed by the vendor upon termination of the license.

Aljabban contends that the Items were not permanent fixtures within the meaning of this provision because paragraph 4 specifically identifies only three items of booth construction—namely "walls, flooring, and security gates." Because this specific list does not encompass a sink/cabinet unit, a water heater or decorative molding, Aljabban argues that the parties did not agree that the Items were permanent fixtures that could not be removed. As Aljabban contends, the language "is very specific and exclusive" in that "[i]t defines 'permanent fixture' and itemizes it was the language 'i.e.' meaning 'that is.' "

We understand Aljabban's argument, and we recognize that the use of the signal "i.e." creates some confusion. The signal "i.e." means "That is," (I.E., Black's Law Dictionary (11th ed. 2019)), and thus normally indicates a clarification of a preceding term, not an example. To communicate that "walls, flooring, and security gates" were meant as *nonexclusive examples* of booth construction, paragraph 4 could have used the signal "e.g.," which means "For example." (E.G., Black's Law Dictionary (11th ed. 2019).) Nevertheless, as we will explain, it appears to us that the contract may merely have used an inexact signal before the words "walls, flooring, and security gates" by choosing the term "i.e.," and that it did not intend to provide an exhaustive and exclusive list of all of the things that could constitute a permanent fixture.

Whether an ambiguity exists in a contract is a question of law, subject to independent review on appeal, and we may refer to extrinsic evidence to determine whether a contract is ambiguous. (*Winet v. Price* (1992) 4

22

Cal.App.4th 1159, 1165 (*Winet*).) As Shapiro testified, there are many types of vendors at the Swap Meet who install different types of fixtures, both when moving into their spaces and while they are doing business, making it impractical to list every possible type of permanent fixture in paragraph 4 of the vendor's permit. Walls, flooring and security gates are fixtures that every vendor would be expected to have in their space, but specific types of businesses might have other fixtures unique to their operations. A beauty salon requires sinks and a water heater; a clothing store does not. Therefore, we conclude that it is at least ambiguous whether the vendor permit intended "walls, flooring, and security gates" as an exhaustive list of the permanent fixtures subject to paragraph 4.

"[P]arol evidence is properly admitted to construe a written instrument when its language is ambiguous." (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.) Here, the trial court admitted precisely such evidence.[11] Shapiro testified that because of the wide range of vendors at the Swap Meet, the list of permanent fixtures in paragraph 4 was not meant to be exhaustive. Aljabban and Carrasco presented no conflicting parol evidence on that issue. When, as here "the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing." (*Id.* at p. 1166.) Based on the evidence, we conclude that the parenthetical reference to "walls, flooring, and security gates" in paragraph 4 was not intended to be an exclusive list of the type of booth construction that would constitute a permanent fixture that could not be removed when the vendor vacated the space.

---

[11] On appeal, Aljabban makes no argument challenging the admission of the parol evidence.

Because the list in paragraph 4 is not exhaustive, it is reasonable to infer, as the trial court did, that by using the term "permanent fixture," paragraph 4 intended to incorporate the Civil Code provisions and case law that defines the circumstances under which something becomes a permanent fixture of real property. We accordingly turn to that body of law to determine whether the Items were permanent fixtures that could not be removed when Aljabban and Carrasco vacated space H-2.

With respect to improvements to real property, Civil Code section 660 defines a fixture as follows: "A thing is deemed to be affixed to land when it is . . . permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws." (Civ. Code, § 660.) " 'The California cases state a general proposition that the landlord will become owner of 'fixtures' affixed by the tenant to the land in the absence of countervailing circumstances. Civil Code section 1013 provides the statutory statement of the rule: "When a person affixes his property to the land of another . . . the thing affixed . . . belongs to the owner of the land" unless (1) there is an agreement between the parties permitting the annexer to "remove" the thing affixed, or (2) the case comes within Civil Code Section 1019, concerning the "removability" of (trade) "fixtures" by tenants.' . . . Such 'fixtures removable by tenants' are called 'trade fixtures.' " (*Goldie v. Bauchet Properties* (1975) 15 Cal.3d 307, 313, citation omitted.)[12]

_____

[12] Civil Code section 1019, which applies to a landlord/tenant relationship, provides: "A tenant may remove from the demised premises, any time during the continuance of his term, anything affixed thereto for purposes of trade, manufacture, ornament, or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises." The question whether an item affixed to real property constitutes a permanent fixture arises in numerous circumstances, not only cases involving landlords

24

" 'It is well settled that in determining whether an article constitutes a fixture, three criteria must be taken into consideration:  (1) the manner of its annexation to the realty; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention with which the annexation is made.' " (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 887.)  Accordingly, as our Supreme Court has explained, "[w]hether a water heater is realty or personalty is, of course, a question of fact, . . .  and various factors must be considered, such as the manner of its annexation, its adaptability to the purpose for which the realty is used, and the intention of the party making the annexation." (*Knell v. Morris* (1952) 39 Cal.2d 450, 456, citation omitted.)  In *Knell,* our Supreme Court held that "it can reasonably be inferred that the heater was attached to the building by means of gas and water pipes, and the evidence, although meager, is sufficient to permit a finding that the heater was permanently affixed to the realty and was adapted to the purpose for which the premises were used," thus concluding that it became part of the real property.  (*Id.* at pp. 456-457.)[13]

---

and tenants.  Civil Code section 1019 applies only *in the absence of a specific agreement about fixtures between the landlord and tenant.*  (*R. Barcroft & Sons Co. v. Cullen* (1933) 217 Cal. 708, 712; *Renner v. Huntington-Hawthorne Oil & Gas Co.* (1952) 39 Cal.2d 93, 103.)  Here, in paragraph 4, the parties *did* enter into a specific agreement that supersedes whatever right to remove trade fixtures Aljabban may have had under Civil Code section 1019. Accordingly, we focus on the terms of the agreement, which refers to "booth construction" becoming a "permanent fixture."

[13]    In *Daniger v. Hunter* (1952) 114 Cal.App.2d 796, 797, the court came to an opposite conclusion about a unique type of appliance unit that "consisted of a gas stove, a sink and a refrigerator, the three fitting together as one unit."  Analyzing the fixture issue in the context of an action to foreclose a mechanic's lien, the court explained, "[i]t seems quite clear that electrical appliances such as refrigerators and stoves are personal property and do not become a part of the realty where, as here, they are movable and can be

25

"The mere fact that" fixtures "can be removed without material damage" to the real property "does not alone establish their character as articles of personalty. . . . [¶] . . . In order to make an article a permanent accession to the land its annexation need not be perpetual. It is sufficient if the article shall appear to be intended to remain where fastened until worn out, until the purpose to which the realty is devoted has been accomplished or until the article is superseded by another article more suitable for the purpose." (*San Diego Trust & Savings Bank v. San Diego County* (1940) 16 Cal.2d 142, 151 (*San Diego Trust*).) "[W]hatever is essential for the purposes for which the building is used, will be considered as a fixture, although the connection between them may be such that it may be severed without physical or lasting injury to either." (*Fratt v. Whittier* (1881) 58 Cal. 126, 131.) As one treatise explains, "If the personalty attached to the realty has a use beneficial and necessary to the real property or to the portion to which it is attached, it is likely to be held to be a fixture, regardless of the method of its attachment." (3 Miller & Starr, Cal. Real Estate (4th ed.) § 9:45.) Although Civil Code section 660 refers to attachment "as by means of cement,

---

disconnected by merely pulling a plug or unscrewing a gas connection. In the instant case the units sold were of three items: a stove, a sink and a refrigerator, so constructed as to form one unit, conserving floor space. While ordinarily a sink is 'built in' and made a part of the building, in the instant case it is part of a unit which is so constructed as to be easily disconnected and removed without damage to the realty or the article itself. Under such circumstances we conclude that these units were chattels and not fixtures." (*Id*. at p. 798.) We do not find *Daniger* to be apposite here because the sink/cabinet unit in this case was not attached to other appliances that are commonly understood to constitute personal property. On the contrary the sink/cabinet unit contained a water heater, which is not an appliance universally viewed as personal property. Moreover, as *Daniger* described the general rule with respect to sinks, "ordinarily a sink is 'built in' and made a part of the building." (*Ibid*.)

plaster, nails, bolts, or screws" (Civ. Code, § 660), this is " 'merely illustrative. An article may be attached other than by the examples given.' " (*Kruse Metals Mfg. Co. v. Utility Trailer Mfg. Co.* (1962) 206 Cal.App.2d 176, 180 [methods of attachment in statute are "illustrative, not inclusive"].)

Here, we agree with the trial court that the Items were permanent fixtures that had been annexed to the real property, both because they were physically attached and because at least some of them were necessary to the use of space H-2 as a beauty salon.[14] With respect to the physical attachment to the real property, the sink/unit and the water heater were functional only if physically attached to the water supply in the building. The evidence established that both the sink/cabinet unit and the water heater were physically attached to the building's plumbing system by hoses, with an additional electrical connection for the water heater. The decorative molding was attached to the wall by staples, and as Shapiro testified, the removal of the decorative molding caused damage to the walls that had to be repaired. Although Aljabban emphasizes that it was relatively easy to disconnect the Items from the building, the ease of disconnection is not the dispositive inquiry. (*San Diego Trust, supra*, 16 Cal.2d at p. 151 ["The mere fact that" fixtures "can be removed without material damage" to the real property "does not alone establish their character as articles of personalty"].)

---

14    Citing *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888, Aljabban contends we must undertake a de novo review when determining whether the trial court properly classified the Items as permanent fixtures. Although not expressly taking issue with Aljabban's contention, defendants generally contend that we should apply a substantial evidence standard of review to the trial court's findings. We need not and do not decide whether a de novo standard applies on the issue of whether the Items were permanent fixtures, as we would reach the same conclusion under either standard of review.

With respect to the Items being necessary for the use of space H-2 as a beauty salon, the testimony at trial was unanimous that a beauty salon requires a water heater and a sink to operate. Indeed, before Carrasco and Aljabban moved into the space, there were preexisting sinks and a water heater, installed by Shapiro. That fact suggests that those items were needed in order to operate the space as a beauty salon. Moreover, the fact that Shapiro originally purchased the sinks and a water heater and testified that he would have spent money to replace them if he was told that replacement was needed, shows that he understood the Items to be permanent equipment that would continue to remain in place, regardless of which salon owners occupied the space.

We accordingly conclude that Items were permanent fixtures within the meaning of paragraph 4 of the vendor's permit, and Aljabban and Carrasco were not entitled to remove them when they vacated the premises. FISM and Shapiro are therefore not liable for breach of contract, breach of the covenant of good faith and fair dealing, or conversion by virtue of having prevented the removal of the Items from space H-2.

C.     *Aljabban's Challenge to the Trial Court's Decision That FISM Properly Retained $680.00 of the Security Deposit*

We next consider Aljabban's contention that the trial court improperly rejected his claim that FISM and Shapiro wrongly retained $680.00 of the $2,680.00 security deposit to cover the repairs that Shapiro testified were necessary after Aljabban and Carrasco vacated space H-2.[15] Aljabban makes two distinct arguments: (1) insufficient evidence supports a finding that the

_____

15     As we understand Aljabban's claims, the failure to return $680.00 of the security deposit relates to the causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and conversion.

28

premises were damaged; and (2) the contractual provisions the parties agreed upon do not allow the retention of a security deposit to repair damage to the premises.

1. *Substantial Evidence Supports a Finding That FISM Incurred Expenses of $680.00 to Repair Damage to Space H-2*

Aljabban takes two approaches to establishing that insufficient evidence supports a finding that FISM incurred expenses of $680.00 in repairing damage to the premises. Specifically, he argues that (1) there was a "failure to adduce evidence to prove the actual damage and actual amount reasonably necessary to remedy whatever the . . . damage was" (emphasis omitted); and (2) FISM and Shapiro are bound to admissions in their discovery responses, which stated that they are not claiming any damages. We discuss each issue in turn.

a. *Shapiro's Testimony Supports a Finding That FISM Incurred Expenses of At Least $680.00 to Repair Damage to Space H-2*

As we have explained, Shapiro testified that FISM withheld $680.00 of the security deposit because he had to incur expenses to (1) purchase two new sinks and remount them; (2) repair a portion of the floor that was removed; (3) fix holes in the drywall where Carrasco had removed the decorative molding; and (4) with respect to the water heater, properly strap it down and hire an electrician to correctly rewire it. Aljabban argues that this testimony was not sufficient to support a finding that FISM incurred $680.00 in expenses because Shapiro did not specify the exact amount of money that he spent on the repairs, and for certain reasons, such as the conflict with other evidence, Shapiro's testimony was "hard to believe."

We reject Aljabban's argument. Although Shapiro did not provide an exact accounting of the amount of expenses he incurred to repair the damage,

29

he explained with some detail the nature of the repairs that were necessary, and he specifically stated that he applied $680.00 of the security deposit to cover the expenses associated with the repairs.  The trial court was entitled to rely on that testimony to conclude that FISM incurred expenses of at least $680.00.  Further, although Aljabban contends that Shapiro's testimony about the type and amount of damage was not believable in light of other evidence presented at trial, it is not our role on appeal to make credibility determinations.  (*Orange Catholic*, *supra*, 28 Cal.App.5th at p. 292.)

b. *The Discovery Responses by FISM and Shapiro Stating That They Are Not Claiming Any Damages in the Action Are Not Relevant to the Issue of Whether FISM Incurred Expenses to Repair Damage to Space H-2*

We next consider Aljabban's contention that the trial court improperly admitted evidence that FISM incurred expenses to repair damage to space H-2 because that evidence was contradicted by discovery responses served by FISM and Shapiro.

As background to this issue, plaintiffs filed a motion in limine for an order "to bar Defendants from introducing any evidence at trial of any damage, loss or repair to FISM Inc. premises regarding Space H2." (Emphasis omitted.)  Plaintiffs' motion in limine relied on case law holding that the function of a discovery response is to "immediately and conclusively bind[] the answering party to the facts set forth in his reply."  (*Coy v. Superior Court of Contra Costa County* (1962) 58 Cal.2d 210, 219.) Plaintiffs contended that "Defendants were repeatedly asked during discovery whether Plaintiffs[] in any way harmed the premises and they categorically stated under oath in multiple places that:  'Defendant is not making any claim for any loss or damages in connection with this matter.' " (Emphasis omitted.)

30

Specifically, plaintiffs pointed to FISM and Shapiro's responses to Form Interrogatory Nos. 7.1, 7.2 and 7.3. In Form Interrogatory No. 7.1 plaintiffs asked, "Do you attribute any loss of or damage to a vehicle or other property to the INCIDENT? If so, for each item of property; [¶] (a) describe the property; [¶] (b) describe the nature and location of the damage to the property; [¶] (c) state the amount of damage you are claiming for each item of property and how the amount was calculated; . . . ." FISM and Shapiro responded that the term " 'INCIDENT' " was "vague, ambiguous and unintelligible" and that the interrogatory was not relevant to the subject matter of the action, and was not reasonably calculated to lead to the discovery of admissible evidence "as Defendant is not making a claim for any loss or damages in connection with this matter."

Form Interrogatory No 7.2 asked if any written estimate or evaluation of the damage to the property had been made, and Form Interrogatory No. 7.3 asked if any item of property referred to in response to Form Interrogatory No. 7.1 had been repaired, and asked for a description of the repair and the cost. FISM and Shapiro responded "Not applicable" to both.

At the beginning of the bench trial, the court stated that instead of ruling on the motions in limine, it would deal with the issues "[a]s things come up." Accordingly, during Shapiro's testimony and the testimony of an FISM manager, counsel for plaintiffs renewed his objection to the admission of any evidence regarding FISM's repair of the physical damage in space H-2 after Aljabban and Carrasco moved out. The trial court overruled the objection. As the trial court observed, the evidence of the damage to space H-2 was "being offered for a limited purpose, as I understand, that's to show that removal of the fixtures or the removal of certain equipment that caused some type of structural damage to the integrity of the building." The trial

31

court explained that the discovery responses were irrelevant because "[t]he defense is not making an affirmative claim for damages against the plaintiff. They're not asking the plaintiff to pay money."

We review the trial court's admission of evidence under an abuse of discretion standard of review. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

We agree with the trial court's analysis in allowing the admission of the evidence regarding FISM's repair to the damage to space H-2 despite FISM and Shapiro's discovery responses stating they were not making any claim for loss or damages. As FISM and Shapiro indicated in their responses to the form interrogatories, they viewed the interrogatories as asking whether they were claiming any damages *that they believed were compensable in the lawsuit.* FISM and Shapiro signaled that understanding by responding that the information sought in Form Interrogatory No. 7.1 was not relevant to the subject matter of the action, and was not reasonably calculated to lead to the discovery of admissible evidence "as Defendant is not making a claim for any loss or damages in connection with this matter." That response cannot reasonably be understood as an admission that there was no damage to the premises after Aljabban and Carrasco moved out or that FISM did not incur any expenses in repairing the premises. The trial court thus did not abuse its discretion in admitting testimony relating to the physical damage to the premises that caused FISM to withhold $680.00 of the security deposit, as FISM and Shapiro never made an admission to the contrary.

2.    *FISM Was Not Entitled Under the Terms of the Parties'*
      *Agreement to Use the Security Deposit to Repair Damage to the*
      *Premises, and Aljabban Should Accordingly Recover on His*
      *Causes of Action for Breach of Contract and Conversion*

Civil Code section 1950.7, subdivision (c), which governs security

deposits for non-residential leases, provides as follows: "The landlord may

claim of the payment or deposit only those amounts as are reasonably

necessary to remedy tenant defaults in the payment of rent, to repair

damages to the premises caused by the tenant, or to clean the premises upon

termination of the tenancy, *if the payment or deposit is made for any or all of*

*those specific purposes.*" (Italics added.) Focusing on the italicized portion of

the provision, Aljabban contends that the security deposit he paid to FISM

may not be used to repair damages to the premises because there was no

agreement between the parties that the deposit was "made for . . . those

specific purposes." (*Ibid.*)

As Aljabban points out, the vendor's permit states that Aljabban and

Carrasco have paid a security deposit in the amount of $2,680.00.[16]

However, the vendor's permit does not state that the security deposit may be

used to repair damage to the premises. Instead, the vendor's permit contains

only two references to the security deposit. First, it states, "Vendor will

forfeit his entire Security Deposit if he violates this clause and sells, transfers

or assigns his space without the consent of Management." Next, it states,

---

[16]    Aljabban made this argument in his written closing argument after
trial, but the trial court did not address the issue in its statement of decision.
Aljabban raised the argument again in his motion to vacate the judgment. At
the hearing on that motion, the trial court commented, "I think those
paragraphs provide for retention of the security deposit for the reasons that
are specified. But . . . I'm not sure I read it to limit retention to only those
grounds."

"Vendor's security deposit is not to be used as Vendor's final month's rent unless approved by Management. Management reserves the sole right to apply Vendor's security deposit toward any monies owed for the free rent or rental concession period." Because the vendor's permit does not specify that the security deposit can be used to cover FISM's expenses in repairing the premises, Aljabban contends that, pursuant to the "specific purposes" language of Civil Code section 1950.7, subdivision (c), FISM was not authorized to keep $680.00 of the security deposit to cover the cost of repairs.

In our view, the plain language of the statute supports Aljabban's argument. On its face, Civil Code section 1950.7, subdivision (c) allows a landlord in a commercial lease to apply the security deposit to the payment of defaulted rent, to the repair of the premises, or to the expense of cleaning the premises only "if the payment or deposit is made for any or all of those specific purposes." That language appears to set up a requirement that, for the landlord to use the security deposit for a specific purpose, the rental agreement must specify that purpose. Although we are not aware of any case law interpreting the relevant statutory language, a leading treatise agrees with our interpretation of the language. "The landlord of nonresidential premises is only entitled to deduct from the deposit those amounts *that are authorized by the terms of the lease.*" (10 Miller & Starr, Cal. Real Estate (4th ed.) § 34:85, italics added.)

We draw further support for our reading of the statutory language when we compare the statutory provision that governs how security deposits may be applied in *residential* leases. Civil Code section 1950.5, subdivision (e) states that a security deposit in a residential lease may be applied by the landlord for "only those amounts as are reasonably necessary" for the following purposes, specified in subdivision (b): "(1) The compensation

of a landlord for a tenant's default in the payment of rent.  [¶]  (2) The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the tenant or by a guest or licensee of the tenant.  [¶]  (3) The cleaning of the premises upon termination of the tenancy necessary to return the unit to the same level of cleanliness it was in at the inception of the tenancy. . . . [¶] (4) To remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear, if the security deposit is authorized to be applied thereto by the rental agreement."  (Civ. Code, § 1950.5, subd. (b).)  The first three uses of the security deposit in Civil Code section 1950.5, subdivision (b) (*i.e.*, to cover defaulted rent, repairs to the premises and cleaning the premises) are the same as the three uses identified in Civil Code section 1950.7, subdivision (c).  But the two statutes are different in that Civil Code section 1950.5, subdivision (b) does not include the proviso, which *is* present in Civil Code section 1950.7, subdivision (c), that "the payment or deposit is made for any or all of those *specific purposes*." (Italics added.)  Instead, Civil Code section 1950.5 simply provides that "[t]he landlord may claim of the security only those amounts as are reasonably necessary for the purposes specified in subdivision (b)."  (Civ. Code, § 1950.5, subd. (e).)  " ' " 'Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed.' " ' "  (*Williams v. County of San Joaquin* (1990) 225 Cal.App.3d 1326, 1332-1333; see also *250 L.L.C. v. PhotoPoint Corp.* (2005) 131 Cal.App.4th 703, 718 (*250 L.L.C.*) [because the Legislature "expressly prohibited waivers of section 1950.5's protections for residential security deposits . . . its failure to do so with respect to commercial security deposits

indicates that waivers are permissible as to those deposits"].)  The distinction between the two statutes here show that the Legislature must have had a specific intention in including the "specific purposes" language in Civil Code section 1950.7, subdivision (c), and that we therefore should make sure to give effect to the language when interpreting the statute.

Even more significantly, the fourth use for a residential security deposit identified in Civil Code section 1950.5, subdivision (b) (*i.e.*, to cover loss of the landlord's personal property) contains a requirement very similar to the "specific purposes" requirement in Civil Code section 1950.7, subdivision (c).  Specifically, a residential landlord may use the security deposit to cover the loss of personal property "*if* the security deposit is authorized to be applied thereto by the rental agreement."  (Civ. Code, § 1950.5, subd. (b), italics added.)  This provision indicates that, in certain circumstances, the Legislature has determined that a security deposit may be used by a landlord for a particular purpose *only if* the parties have agreed on that use when entering into the rental agreement.  In that light, Civil Code section 1950.7 subdivision (c), is reasonably understood as setting up another such requirement.  We therefore conclude that a security deposit in a commercial lease may be applied by the landlord to cover defaulted rent, costs of repair or costs of cleaning only if "made for any or all of those specific purposes" as stated in the parties' agreement.  (Civ. Code, § 1950.7, subd. (c).)

Moreover, we note that it is consistent with California public policy regarding commercial leases for the Legislature to have required that the parties specify the purpose of the security deposit in their lease agreement, even though such specification is generally not required in residential leases.  The Legislature has declared that "[i]t is the public policy of the state and fundamental to the commerce and economic development of the state to

36

enable and facilitate freedom of contract by the parties to commercial real property leases." (Civ. Code, § 1995.270, subd. (a)(1); see also *250 L.L.C.*, *supra*, 131 Cal.App.4th at p. 718 [noting public policy of enabling and facilitating freedom of contract in commercial leases when determining that parties to commercial leases can waive the statutory protections for security deposits].)

Here, as Aljabban correctly points out, the vendor's permit did not state that the security deposit could be used by FISM to repair damage to the premises caused by Aljabban and Carrasco. Accordingly, because the parties entered into an agreement in a commercial context rather than a residential context, FISM was not authorized to use the security deposit to cover its expenses in repairing the premises.

Aljabban asserted that the withholding of the $680.00 from the security deposit supported his cause of action for breach of contract and breach of the covenant of good faith and fair dealing against FISM and Shapiro, as well as his conversion cause of action against FISM. We conclude that judgment should be entered in Aljabban's favor on the breach of contract and conversion causes of action against FISM. FISM failed to return $680.00 that was owed to Aljabban under the vendor's permit, supporting a finding in favor of Aljabban on both of those causes of action.

However, in light of the evidence at trial, we do not believe that the failure to return $680.00 of the security deposit supports a judgment in favor of Aljabban on the cause of action for breach of the covenant of good faith and fair dealing. " ' "[B]reach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself" and it has been held that "[b]ad faith implies unfair dealing rather than mistaken judgment." ' " (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990)

37

222 Cal.App.3d 1371, 1394.) "[I]t has been suggested the covenant has both a subjective and an objective aspect—subjective good faith and objective fair dealing. A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372.) "To the extent the implied covenant claim seeks simply to invoke terms to which the parties *did* agree, it is superfluous." (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 352.) Here, the evidence does not support a finding of bad faith or unfair dealing beyond a breach of the contractual agreement itself. Indeed, all of the evidence indicates that FISM's breach was unknowing and unintentional, caused by a misunderstanding of the permissible uses of the security deposit in light of the language of the vendor's permit.

Further, there is no basis to find Shapiro liable for the withholding of $680.00 from the security deposit. Aljabban did not sue Shapiro for conversion, and although Aljabban named Shapiro as a defendant in the breach of contract cause of action, the vendor's permit was entered into by FISM as a corporate entity. Absent a successful attempt to pierce FISM's corporate veil—which Aljabban did not attempt to undertake at trial—Shapiro's role as FISM's president does not subject him to liability for FISM's breach of contract. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 ["Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations," but "[a] corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation"].)

We note that Civil Code section 1950.7, subdivision (f) states, "The bad faith retention by a landlord or transferee of a payment or deposit or any portion thereof, in violation of this section, may subject the landlord or the transferee to damages not to exceed two hundred dollars ($200), in addition to any actual damages." The evidence at trial does not support a finding of bad faith against FISM to support an additional $200.00 award.

We will reverse the judgment as to Aljabban and direct that the trial court enter judgment in favor of Aljabban on his causes of action for breach of contract and conversion against FISM in the amount of $680.00.

D.     *The Trial Court Properly Concluded That FISM Had the Right to Deny Renewal of the Vendor's Permit*

Aljabban next argues that the trial court should have found FISM and Shapiro liable for breach of contract and breach of the covenant of good faith and fair dealing because their "official excuse for terminating Plaintiffs' license or lease was something not in the contract—that Plaintiffs' business was not doing well." Aljabban also contends that "Defendants also breached the contract by failing to renew since plaintiffs paid their rent" as required by the vendor's permit.

As we have explained, the trial court found that the evidence and the contractual language did not support a finding that the parties agreed to a yearly renewal as long as the rent was paid or that FISM required any reason to decline to renew the vendor's permit after the year-long term expired. The trial court based its decision on the fact that the terms of vendor's permit "clearly reflect a term of <u>one year</u>" and "contain <u>no</u> language whatsoever reflecting an obligation by FISM to automatically renew these agreements from year to year." Further, the trial court relied on evidence of FISM's "custom and practice of yearly re-renewal of license agreements for all its vendors. Nothing was automatic so long as rent was paid." The trial

39

court also found that "the terms of the vendor license agreement did not require a reason or cause to not renew the license."

Aljabban presents no basis for us to reverse the trial court on these issues. Substantial evidence supports the trial court's decision that FISM had the right to deny renewal of the vendor's permit without a reason and regardless of whether Aljabban and Carrasco timely paid their rent.[17]

E.   *Aljabban's Contention That He Was Denied a Fair Trial*

Aljabban's last contention is that because of "many conducts [*sic*] and omissions on the record and off the record during the trial" he believes that he was "denied due process and did not receive fair trial or just outcome [*sic*]."

As in his declaration filed in support of the motion to vacate the judgment and motion for a new trial, Aljabban claims that Shapiro engaged

---

[17]   For the first time in his appellate reply brief Aljabban challenges the trial court's decision on the causes of action for civil assault and battery, and for negligent and intentional interference with prospective economic advantage. Specifically, Aljabban argues that in light of the evidence presented at trial, defendants should have been found liable for civil assault and battery, and punitive damages should have been assessed. Further, he argues that "seizing plaintiffs' equipment deprived them of the opportunity to sell or reallocate it and constituted intentional and negligent interference with prospective economic advantage." (Emphasis and capitalization omitted.) Based on " ' "[o]obvious considerations of fairness," ' " we will not consider an argument made for the first time in the reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Moreover, even were we to consider the issues, Aljabban has presented no reason for us to disregard the trial court's finding that there was no merit to the cause of action for civil assault and battery because Ramirez was credible when he testified that he had no physical contact with Carrasco and he did not assault Carrasco's mother. Further, to the extent Aljabban now argues that defendants engaged in interference by not allowing him and Carrasco to take the Items when they vacated the premises, we have concluded that the Items were permanent fixtures that were required to remain in space H-2.

40

in "taunting, mockery and distraction" by making faces and other gestures while Carrasco and Aljabban were testifying. He also claims that defendants' attorney used gestures to indicate how Shapiro should answer certain questions during his testimony, and that Shapiro made gestures to defendants' witness in the same manner. In addition, without any evidence in the record to support the contention, Aljabban claims that in a conversation that was held "off the record," the trial court stated on the second day of trial that "Plaintiffs should have sued the former vendor who sold the salon to them," which plaintiffs understood "to mean that they had lost the case," causing them to "bec[o]me discouraged" and emboldening Shapiro's misbehavior.

As Aljabban points out, the alleged distracting behavior by Shapiro in the courtroom was brought to the trial court's attention twice during the trial. First, during a break in Carrasco's testimony, plaintiffs' counsel stated that he had called for a break "because I noticed unusual behavior on the part of the witness, and she indicated that she was being—each time she was receiving some signs and mocking from the defendant in the back, and that was distracting [to] her [ability to] answer and concentrate and give testimony. Whatever it's worth, I want to bring that to the Court's attention. I don't know if she needs to sit here or face that way to make sure . . . we can move this smoothly. And the reason it is important is something even worse happened during the deposition." Plaintiffs' counsel then started to explain what happened during the deposition. The trial court stated, "We don't need to go there," and then indicated, "Let's go ahead." Plaintiffs' counsel did not ask the trial court to take any action, and it is unclear if Carrasco physically shifted her position, as plaintiffs' counsel suggested, so that she could no longer see Shapiro.

41

Second, at the end of his direct examination, Aljabban interjected, "Your Honor, can I say something, please?"  He then continued, "I want the man turning his face over there because he's laughing at me," apparently referring to Shapiro.  Plaintiffs' counsel did not ask for any relief from the trial court based on Shapiro's alleged behavior.  The trial court indicated that counsel should proceed with cross-examination.

In both cases, the record does not reflect whether the trial court concurred with the description of Shapiro's behavior as stated by plaintiffs' counsel and Aljabban.  Further, there is no indication in the record whether the problem that plaintiffs perceived with Shapiro continued during the rest of Carrasco's or Aljabban's testimony.

Although Aljabban's argument is not clear, he apparently contends that the trial court denied him a fair trial because of how it responded to Shapiro's alleged misbehavior during the trial.  " 'An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the lower court by some appropriate method.  The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver.  Often, however, the explanation is simply that it is unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' " (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184.)  "Moreover, it would be inappropriate to allow a party not to object to an error of which the party is or should be aware, ' "thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not." ' " (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.)

"A court has inherent power to exercise reasonable control over all proceedings connected with the litigation before it . . . and maintain 'the dignity and authority of the court' . . . , and to summarily punish for acts committed in the immediate view and presence of the court when they impede, embarrass or obstruct it in the discharge of its duties." (*Mowrer v. Superior Court* (1969) 3 Cal.App.3d 223, 230, citations omitted; see also Code Civ. Proc., § 128, subd. (a) ["Every court shall have the power to do . . . (1) To preserve and enforce order in its immediate presence" and "(3) To provide for the orderly conduct of proceedings before it, or its officers"].) Thus, in this case, if plaintiffs' counsel had made a request for the trial court to intervene, we would expect the trial court to have assessed the situation and to have taken reasonable steps to preserve a respectful courtroom atmosphere conducive to a fair trial. However, because plaintiffs' counsel made no specific request of the trial court to exercise such control and did not give the trial court any occasion to state on the record whether it perceived any objectionable behavior by Shapiro, we do not consider Aljabban's appellate contention that he was denied a fair trial due to the trial court's lack of response to Shapiro's alleged misbehavior.

F. *The Attorney Fee and Costs Award*

The attorney fee provision in the vendor's permit states, "In the event it becomes necessary to institute legal proceedings to enforce the terms of this License, the prevailing party shall be entitled to an award of Attorney's fees and court costs." As defendants were the prevailing parties on all causes of action, the trial court relied on the attorney fee provision in the vendor's permit to order that Aljabban and Carrasco pay attorney fees to defendants

43

in the amount of $121,043. The trial court also ordered Aljabban and Carrasco to pay $14,374.60 in costs.

In relevant part, Civil Code section 1717 provides, "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable . . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit. . . . [¶] (b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section." (Civ. Code, § 1717.)

Here, the trial court awarded attorney fees and costs to defendants based on its judgment in favor of defendants on all of the causes of action, which clearly made defendants the prevailing parties. Because we are reversing the judgment and directing that judgment be entered in favor of Aljabban on the breach of contract and conversion causes of action in the amount of $680.00, we must necessarily reverse the trial court's attorney fee and costs award as it relates to Aljabban. (*Cutujian v. Benedict Hills Estates Assn.* (1996) 41 Cal.App.4th 1379, 1390 ["In view of our reversal of the judgment, the order awarding attorney fees must also be reversed."]; *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 551 ["Since we reverse the judgment, we also reverse the award of attorney fees because [defendant] is

44

no longer necessarily the prevailing party in this action"]; *Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 ["An order awarding costs falls with a reversal of the judgment on which it is based"].)

We accordingly reverse the attorney fee and costs award with respect to Aljabban, and we remand to the trial court to take appropriate action on the issue of attorney fees and costs in light of the applicable legal standards. We express no view on how the issue of attorney fees or costs should be resolved on remand, including the attorney fees incurred in this appeal.

## DISPOSITION

We reverse the judgment denying relief to Aljabban on all causes of action, and we direct the trial court to issue a new judgment as to Aljabban granting him relief against FISM on the causes of action for breach of contract and conversion in the amount of $680.00. The judgment shall specify that the defendants prevail against Aljabban on all of the remaining causes of action. Further, we reverse the order requiring Aljabban to pay attorney fees in the amount of $121,043, and costs in the amount of $14,374.60, and we direct the trial court on remand to consider the issue of attorney fees and costs, as concerns Aljabban, in light of the applicable legal standards. Carrasco is not a party to this appeal, and our disposition does not reverse the judgment or the attorney fee and costs order as to Carrasco. The parties are to bear their own costs on appeal.


IRION, J.


WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

45

Filed 9/10/20

| | |
|---|---|
| MOHAMED ALJABBAN, | D076214 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVDS1312923) |
| FONTANA INDOOR SWAP MEET, INC., et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | |

THE COURT:

The opinion in this case filed August 18, 2020, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.


HUFFMAN, Acting P. J.

Copies to:  All parties